**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**SOUTHERN DIVISION**
**LONDON**

**CRIMINAL ACTION NO. <u>6:25-CR-94-SCM</u>**

**UNITED STATES OF AMERICA** **PLAINTIFF**

**V.** **<u>SENTENCING MEMORANDUM ADDRESSING DEFENDANT'S GUIDELINE OBJECTIONS</u>**

**FRANKLIN DELANO CAMPBELL** **DEFENDANT**

* * * * *

The United States of America submits the following response in opposition to the Defendant's objection to the Presentence Investigation Report (PSR). [R. 103: Defendant's Sentencing Memorandum (Campbell).] In support of this position, the Government states as follows:

## I. Facts

Defendant Campbell was charged with conspiracy to distribute five (5) kilograms or more of a cocaine mixture and two hundred eighty (280) grams of a crack cocaine mixture, as well as six (6) substantive distribution of crack cocaine charges. [R.1: Indictment.] Campbell pled guilty to the conspiracy charge by way of a written plea agreement on or about May 1, 2026. [R. 84: Plea Agreement (Campbell); R. 91: Minute Entry for Rearraignment (Campbell).] In his plea agreement, Campbell admitted to

having been involved in this conspiracy from sometime in or about January of 2022, the exact date unknown, and continuing until sometime on or about November 21, 2025" – that is, approximately forty-six (46) months. [R. 84: Plea Agreement (Campbell) at ¶ 3(a).] Campbell further admitted that "[d]uring this timeframe" he was "obtaining one-half kilogram to one[]kilogram quantities of powder cocaine for an out-of-state source of supply" which he would bring back to Kentucky for distribution as both powder and crack cocaine. *Id*. at ¶3(b).

Defendant Campbell's sentencing is set for Wednesday, September 2, 2026. [R. 92: Order Setting Sentencing (Campbell).] Curiously, despite his admissions as to time and quantity as set forth in the plea agreement, Campbell has now objected to the applicable drug quantity in the PSR. The United States Probation Office has (correctly) calculated Campbell's base offense level at a level thirty-two (32) based on drug quantity, which corresponds to at least fifteen (15) kilograms but less than fifty (50) kilograms of powder cocaine. The Defendant asserts that his base offense level should instead be set at a level thirty (30). Campbell has also objected to the two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) for possession of a dangerous weapon –that is, firearms – during the timeframe of the offense. For the reasons set forth below, the Court should overrule both objections.

## II. Applicable Law

### A. Drug Quantity Calculation

At sentencing, the United States must prove the applicable drug quantity attributable to a defendant by a preponderance of the evidence. *United States v. Jackson*, 470 F.3d 299, 310 (6th Cir. 2006) (citing *United States v. Swanberg*, 370 F.3d 622, 625 (6th Cir. 2004)). "Where exact drug quantity cannot be established, a district court may make a reasonable quantity estimate if that estimate is supported by the preponderance of the evidence." *United States v. Reed*, 72 F.4th 174, 190 (6th Cir. 2023) (quoting *United States v. Treadway*, 328 F.3d 878, 885 (6th Cir. 2003)). However, courts should "err on the side of caution" and only hold a defendant responsible for that quantity of drugs "for which he is more likely than not actually responsible." *Id*. (quoting *United States v. Rios*, 830 F.3d 403, 436 (6th Cir. 2016) and *United States v. Johnson*, 732 F.3d 577, 581 (6th Cir. 2013)). Importantly, the court may rely on hearsay evidence at sentencing to determine drug quantity, so long as the information has "some evidentiary basis" to satisfy a "minimal indicium of reliability." *United States v. Armstrong*, 920 F.3d 395, 398 (6th Cir. 2019) (citations omitted). This indicia of reliability is a "relatively low hurdle." *Id*. (citing *United States v. Moncivais*, 492 F.3d 652, 659 (6th Cir. 2007)).

### B. Weapon Enhancement

"The Sentencing Guidelines increase a defendant's offense level for a drug-trafficking crime by two points '[i]f a dangerous weapon (including a firearm) was possessed.'" *United States v. Kennedy*, 65 F.4th 314, 318 (6th Cir. 2023) (quoting USSG

§ 2D1.1(b)(1)). The commentary on this enhancement explains that it "reflects the increased danger of violence when drug traffickers possess weapons" and "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *Id*. (emphasis added) (quoting USSG § 2D1.1 cmt. n. 11(A)).

"Once the government establishes by a preponderance of the evidence that '(1) the defendant actually or constructively "possessed" the weapon, and (2) such possession was during the commission of the offense,' the burden shifts to the defendant to show that it was 'clearly improbable' that the weapon was connected to the offense." *United States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007) (quoting *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir. 1996)). "If [the defendant] fails to meet this burden, the district court should apply the enhancement." *Id*. at 606-07 (citing *United States v. Shults*, 68 F. App'x 648, 653 (6th Cir. 2003)). In other words, an inability to meet this burden ends the inquiry.

### 1. Actual and Constructive Possession

Along these lines, the law recognizes two forms of possession – actual and constructive. *See United States v. Crump*, 65 F.4th 287, 294 (6th Cir. 2023) (citing *United States v. Latimer*, 16 F.4th 222, 225 (6th Cir. 2021) (addressing the differences in possession in relation to a charge of possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1)). Actual Possession is exactly what it says – the direct, physical control over an object and knowledge of the same. *See* Pattern Crim. Jury Instr.

2.10 and 2.10A 6th Cir. (2023). "A person actually possesses a gun if he at some point has 'actual and physical control' over the gun." *Id.* (quoting *United States v. Brooks*, 987 F.3d 593, 601 (6th Cir. 2021)). "[N]othing in the word 'possess' requires a defendant to retain control of the gun for any lengthy period of time." *Id.* In other words, there is no "minimum temporal prerequisite" to the concept of possession. *Id.* A jury could find that a defendant possessed a firearm "if he had knowing control of a gun 'at a given time.'" *Id.*

Constructive Possession is the right to exercise control over an object, either directly or through someone else, and knowledge of the same. *See* Pattern Crim. Jury Instr. 2.10 6th Cir. (2023). Constructive possession "exists when a person . . . knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *Crump*, 65 F.4th at 295 (quoting *United States v. Moreno*, 933 F.2d 362, 373 (6th Cir. 1991)). Importantly, the presence of a person near guns "alone cannot show the requisite knowledge, power, or intention to exercise control over the [ ] firearms." *Id.* (citation omitted). "'[T]he quantum of evidence necessary to' establish constructive possession when a person is in close proximity to the item at issue 'is minimal.'" *Id.* (citing *United States v. Walker*, 734 F.3d 451, 456 (6th Cir. 2013)). A defendant's ability to exercise "dominion and control" over the location where firearms are located is sufficient to support a finding of constructive possession. Id. (citation omitted).

**2. Joint Possession**

Two or more persons may share actual or constructive possession over property. *See United States v. Chesney*, 86 F.3d 564, 573 (6th Cir. 1996) (upholding the Sixth Circuit's pattern jury instruction concerning joint possession; *see also* Pattern Crim. Jury Instr. 6th Cir. (2023). In *Chesney*, the Court upheld the district court's use of the joint possession pattern instruction where two defendants were riding in a vehicle together in which a gun was found. *Chesney*, 86 F.3d at 573.

## III. Argument

The United States relies on the reasoning set forth in the Addendum to the PSR as it pertains to the Defendant's objections, and incorporates those fully herein by reference. It should also be mentioned that the United States anticipates presenting witness testimony at sentencing in support of both arguments.

**A. The Drug Quantity is Correct.**

From the outset, Campbell's objection ignores the most obvious fact that cuts against his position – his own admissions as set forth in the plea agreement. Specifically, Campbell admitted to being involved in a 46-month cocaine trafficking conspiracy in which he was obtaining anywhere from one-half kilogram to a full kilogram at a time from his source of supply. Ignoring all other evidence and using the most conservative estimate possible – that being one-half kilogram once a month for the duration of the conspiracy – would put him at 23 kilograms of cocaine. This quantity is well beyond the floor for the calculated base offense level. In light of these facts, Campbell's objection

fails in the face of his plea agreement. This, however, is not the only basis for overruling the objection. There is significant additional reliable evidence to support the USPO's calculation.

The statements from the multitude of cooperating witnesses further support Probation's calculation. Along these lines, it should be noted that out of the approximately twelve (12) witness/cooperator interviews referenced in the PSR, seven (7) of these statements come from named, indicted and unindicted coconspirators. This fact alone certainly provides some level of credibility beyond that of a mere unnamed informant. Second, the accounts provided by these cooperators are consistent to the point that they sufficiently corroborate each other. Nearly all state that: (1) Campbell paid them to drive to the same out-of-state location to meet the same unidentified, but similarly-described source of supply; (2) Campbell was using numerous other persons besides themselves, consistently identified by each witness, to make these trips; (3) once there, they would pick up anywhere between one-half kilogram to one kilogram of powder cocaine from Campbell's source; and (4) that Campbell was sending people to make these trips at least twice a month, and sometimes more. There is no meaningful deviation in these statements. More importantly, perhaps, is the fact that these statements are consistent with Campbell's own admissions. This alone is well beyond the "sufficient indicia of reliability" standard required by the law.

Beyond this, the overall investigation corroborates the witness statements and independently acts to prop up the drug quantity calculation. Law enforcement executed

two traffic stops over the course of the investigation. Each stop yielded the seizure of approximately one-half kilogram of cocaine bound for Campbell. These quantities are consistent with the historical information outlined above. Even more convincing is the fact that the stops occurred approximately seventeen (17) months apart! In addition, law enforcement made nine (9) controlled purchases of cocaine from Campbell or one of his associates between July of 2024 and November of 2025. Not once was Campbell out of cocaine when they made a buy. Even though most of these buys were for small, user amounts, the longevity also acts to prop up the reliability of the drug quantity calculation. Finally, when law enforcement executed the ultimate take-down and search warrant in December of 2025, they located and seized a large quantity of powder cocaine, a large quantity of crack cocaine, and over $110,000 in cash from Campbell. According to codefendant Pamela Collins, $14,000 of this money was bound for Campbell's source within the next few days to re-up on an additional one-half kilogram of drugs. This fact, coupled with the total amount of money seized, is further corroborative of the extent of this conspiracy and the quantities that Campbell was capable of distributing.

Here, the Defendant's objection relies primarily on the statement by unindicted co-conspirator Timothy Bruce Hurt concerning his admission that he transported approximately twenty (20) pounds of cocaine for the Defendant. Specifically, Campbell argues that some of the numbers used by the USPO in calculating the base offense level improperly rely on double-counting Hurt's twenty (20) pounds with other load drivers. This argument is fatally flawed for two reasons. First, the argument assumes that all of

the other load drivers traveled with Hurt. This is simply incorrect. While there certainly was some overlap in trips between drivers, Campbell used a myriad of combinations to fetch his drugs. It was never always just Hurt and another one of the identified co-conspirators making trips. Which leads us to the next point. Second, and more egregiously, Campbell either overlooks or intentionally omits the duration of Hurt's involvement. In April of 2025, Hurt gave a statement to law enforcement that he had transported 20 pounds of cocaine for the Defendant *over the past year*. As noted above, Campbell was involved in this conspiracy from January of 2022 through November of 2025. That leaves approximately 34 months – the overwhelming majority of this scheme – wholly unaccounted for in the defense's proposed calculation. Taken at face value, that puts Hurt being involved in 11.1 kilograms of cocaine in just one year's time. Given those quantities, it is inconceivable that the other 34 months of drug dealing would have yielded less than 4 additional kilograms of cocaine.

The foregoing facts, all of which are corroborative of each other, are more than sufficient to establish the applicable drug quantity by the required preponderance standard. Indeed, given the overall weight and consistent nature of the evidence, the United States believes steers into territory of beyond a reasonable doubt. This being the case, the objection should be overruled.

**B. The Weapon Enhancement was Correctly Applied.**

The USPO correctly applied the weapon/firearm enhancement pursuant to U.S.S.G. § 2D1.1(b)(1). Not only did Campbell possess all of the firearms seized from in

and around his property in connection with the warrants of April 2023, one of which was located in the living room of his home, and October of 2023, but numerous cooperators have stated, consistently, that Campbell took firearms – among other items – in trade in exchange for drugs.

Facts matter in this analysis. The evidence here shows that Campbell owned numerous shacks, outbuildings, and other houses in and around his own residence. Campbell would rent these structures to other persons. The evidence shows that he targeted people that were addicts and had nowhere else to go or people to turn to. Campbell would then start selling them crack. Once they became addicted, they became almost fully reliant on Campbell for drugs, food, money, and other necessities. As they became more and more indebted to him, Campbell would then offer to let them mule cocaine from his source or sell drugs to his customers as a way to cover their rent. In this way, Campbell created a self-sustaining drug trafficking operation in which he held all the money, drugs, and power. *See* PSR at ¶¶ 21-26, 28, and 30.

It is uncontroverted that law enforcement executed a warrant at Campbell's residence on or about April 13, 2023. During this warrant they located and seized small quantities of powder and crack cocaine, prescription pills, a Glock, .40 caliber handgun, a Marlin, 30/30 caliber rifle and drug paraphernalia from an outbuilding on Campbell's property, and a Sig Sauer, 9mm caliber pistol from under the living room coffee table at Frank's house. First, Campbell is certainly on the hook for the firearm in his home – the same home that he admitted to selling cocaine and crack from in his plea agreement

during the same timeframe as the warrant. Campbell had actual, physical possession of this firearm – even though he is a multi-time convicted felon and prohibited from possessing guns.[1] Putting everything else aside, this alone shifts the burden to the Defendant to establish that it was "clearly improbable" that the firearm was connected to the offense – a high burden to meet. Second, given the nature of how this drug trafficking organization worked, Campbell would also be on the hook for the guns found in the outbuilding in the curtilage of his residence. Notably, this is the same outbuilding where the drugs and drug paraphernalia were also found. It does not matter that someone else – be it Michael Hurt or Dylan Jent, both of whom have been identified as co-conspirators – may have been staying/living in the outbuilding. The fact remains that Campbell still maintained a possessory interest in the building and he was the one orchestrating the drug trafficking operations on the property. In this regard, Campbell would have had joint, constructive possession of these guns. Beyond that, the enhancement would still apply in the context of a drug trafficking conspiracy if the codefendant possessed a firearm and the possession of this firearm was reasonably foreseeable to the defendant. *See United States v. Barron*, 940 F.3d 903, 911-912 (6th Cir. 2019). Given the evidence that Campbell held firm control over the operation, the property, and indeed, the lives of many of his co-conspirators, it is almost impossible to imagine a situation in which Campbell did not have actual knowledge – much less reasonable foreseeability –

[1] It is also worth noting that one of the confidential informants advised law enforcement back in January of 2023 that Campbell kept a pistol under the coffee table in the living room – the exact location where this gun was found, establishing accurate predicative information that acts to confirm this informant's reliability.

concerning the firearms in the outbuilding located mere feet from his own home. This same logic applies to the October 2023 search.

Again, it is uncontroverted that law enforcement executed a second warrant on Campbell's property in October of that same year – just six (6) months after the first warrant. This search was precipitated by a traffic stop in which law enforcement had seized approximately one-half kilogram of cocaine that was *en route* to Campbell's home. The execution of this warrant yielded the location and seizure of additional drug paraphernalia, a DVR surveillance system, over $6,000 in cash from inside Campbell's home, and three long guns from an outbuilding. Campbell was still a prohibited person. As noted, the same logic related to the first warrant applies in equal force to these firearms. As such, Campbell's possession has been established. Even if the Court disagrees, the presence of the firearms by others in an area controlled by Campbell suggests reasonable foreseeability.

Again, once the United States has established possession and/or reasonable foreseeability, the burden shifts to the Defendant. Here, Campbell simply cannot produce sufficient evidence to establish clear improbability. This is due, in part, to the statements by numerous cooperators that Campbell always kept or maintained firearms and that he took guns in trade for dope. *See* PSR at ¶¶ 9, 11, 21, and 28. Like the statements concerning drug quantity, these statements are unsurprisingly consistent, making them corroborative of each other. Couple this with the facts concerning seizures and the one

firearm Campbell pawned during the conspiracy,[2] the evidence is overwhelming that the enhancement was correctly applied.

## IV. Conclusion

Based on the foregoing, the Court should deny the Defendant's objections to the PSR.

Respectfully submitted,

JASON D. PARMAN
UNITED STATES ATTORNEY

By: /s/ *W. Samuel Dotson*
Assistant United States Attorney
601 Meyers Baker Rd. Suite 200
London, KY 40741
(606) 330-4827
william.s.dotson@usdoj.gov

[2] Although Campbell disputes pawning this gun, the United States is prepared to present evidence from the case agent that someone would have to had presented Campbell's identification, presumably his operator's license, to the business in order to pawn the firearm. In light of everything else we know about the case, it seems absurd to argue that the person pawning the gun was not the Defendant absent his testimony to the contrary.

**CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2026, I electronically filed this document through the ECF system, which will send notice of the filing to all counsel of record.

*/s/ W. Samuel Dotson*
Assistant United States Attorney